Filed 4/21/2016 11:09:12 AM
Janet Gates
Cherokee County - District Clerk            District Clerk
Cherokee County, Texas

Kelly Curry

2016-04-0268
NO. _____

| | | |
|---|---|---|
| STEPHANIE ANN HART, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | |
| JAMES L. WASSON, WOMENS TOTAL | § | CHEROKEE   COUNTY, TEXAS |
| CARE OF EAST TEXAS, P.A., ROBBIN | § | |
| EVANS, JANETTE McBRIDE and TONI | § | |
| RICHEY, | § | |
| Defendants. | § | |
| | § | 2nd  JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION & REQUEST FOR DISCLOSURE

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES STEPHANIE ANN HART (Plaintiff or Mrs. Hart),

and files this her Plaintiff's Original Petition and Request for Disclosure,

complaining of Defendants, **JAMES L. WASSON** (Defendant Wasson),

**WOMENS TOTAL CARE OF EAST TEXAS, P.A.** (Defendant P.A.),

**ROBBIN EVANS** (Defendant Evans), **JANETTE McBRIDE** (Defendant

McBride), and **TONI RICHEY** (Defendant Richey) and in support of same

would show the Court the following:

## I.
## VENUE AND DISCOVERY

Venue is proper, indeed Mandatory in Cherokee County, Texas, under

Section 15.017 of Texas Civil Practice & Remedies Code (1985) in that

Plaintiff asserts claims for slander and/or invasion of privacy, and has elected the county of Plaintiff's long-time residence at the time of the accrual of her cause of action (i.e. Cherokee County, Texas) as one of the four (4) alternative mandatory venue choices allowed to her by the clear terms of §15.017.

Plaintiff alleges claims for unliquidated damages, but in an amount within the jurisdictional limits of this Court. Although most of the damages alleged by Plaintiff take the form of unliquidated damages, the precise amount of which must be determined exclusively by the jury, because Rule 47 Texas Rules of Civil Procedure requires, Plaintiff alleges her damages are not less than $1,000,000.

Plaintiff hereby elects Discovery Level 2 in this case, pursuant to Rule 190.3 of Texas Rules of Civil Procedure.

## II.
## PARTIES

Plaintiff, **Stephanie Ann Hart**, is an individual U.S. Citizen, a Texas Citizen and a long-time resident of Cherokee County, Texas.

Defendant, **James L. Wasson**, is an individual Texas citizen believed to also be a resident of Cherokee County, Texas (or to have at least been a resident of Cherokee County, Texas, at the time of the accrual of Plaintiff's

**PLAINTIFF'S ORIGINAL PETITION,**
**Page 2.**

cause of action on October 7, 2015). He may be served with Citation, with a copy of this Petition attached, at his business address of: **649 S. Broadway Avenue, Tyler, TX 75701.**

Defendant, **Womens Total Care of East Texas, P.A.,** is believed to be a Texas Professional Association (with its sole Member and President being Defendant, James L. Wasson). It may be served with Citation, with a copy of this Petition attached, by serving its Registered Agent, James L. Wasson, at his business address of: **649 S. Broadway Avenue, Tyler, TX 75701.**

Defendant, **ROBBIN EVANS,** is an individual Texas Citizen believed to be a resident of Smith County, Texas. She may be served with Citation, with a copy of this Petition attached, at her business address of: **649 S. Broadway Avenue, Tyler, TX 75701.**

Defendant, **JANETTE McBRIDE,** is an individual Texas Citizen believed to be a resident of Smith County, Texas. She may be served with Citation, with a copy of this Petition attached, at her business address of: **649 S. Broadway Avenue, Tyler, TX 75701.**

Defendant, **TONI RICHEY,** is an individual Texas Citizen believed to be a resident of Smith County, Texas. She may be served with Citation,

with a copy of this Petition Attached, at her address of: **12860 Brushy Hollow St., Lindale, TX 75771.**

## III.
## FACTS

1. Plaintiff, Mrs. Stephanie Ann Hart, is a 49-year-old African-American U.S. Citizen, a Texas Citizen and long-time resident of Alto, Texas, in Cherokee County, Texas.

2. Mrs. Hart has been married many years to her husband, Chamberlain Hart, with whom she has four (4) biological children (2 are adults).

3. Mrs. Hart is a long-time trusted employee of over 25 years of the Texas Department of Criminal Justice, serving, as of October 2015, as a full-time Correctional Officer at the Skyview Prison Unit in Rusk, Cherokee County, Texas.

4. Mrs. Hart was, in October 2015, a long-time medical patient of Defendant, James L. Wasson; first becoming a patient when he opened his medical office in Jacksonville, Texas, years ago (i.e. Defendant Wasson delivered 1 of her 4 children).

5. Years ago, Defendant Watson moved his medical practice to Tyler, Texas, where Mrs. Hart has continued to receive treatment, including her annual OB GYN exam, and other routine care.

6. On Wednesday, October 7, 2015, Mrs. Hart appeared for an appointment for her annual OB GYN physical examination at the offices of Defendant, P.A., in Tyler, Texas, at 8:00 AM.

7. Mrs. Hart agreed, when requested, to submit to the performance of her annual OB GYN exam by a Nurse Practitioner, employed by Defendant, P.A.; whom she subsequently learned to be Defendant, Robbin Evans.

8. Mrs. Hart was shown to a private exam room at the offices of Defendant, P.A. at or near 8:00 AM, instructed to remove her clothing in preparation for the OB GYN exam by Nurse Practitioner Evans, and provided a medical gown to cover herself during the exam.

9. When Nurse Practitioner Evans entered the room, Mrs. Hart noted she appeared more formally dressed than one would have expected for the job at hand (i.e. she was wearing heels and jewelry).

10. Evans stated to Mrs. Hart that she recognized her; that she had worked for Dr. Wasson years before (when his practice was in Jacksonville), had left for several years, but was "back," and glad to see" Mrs. Hart again.

11. Mrs. Hart told Evans of a complaint of a sore throat, and Evans asked a staff member to take a throat culture which later tested positive for

an infection (approximately 10 minutes passed awaiting the test results).

12. Evans completed, without episode, the OB GYN exam, picked up her laptop computer, and left the room, so Mrs. Hart could get dressed.

13. After Mrs. Hart had dressed, a female staff member came in, took a throat culture, and left.

14. Evans then re-entered the room (laptop in hand) to finish the appointment and provide Mrs. Hart with paperwork for the front desk.

15. Mrs. Hart noticed, however, that Evans began to search the floor and surrounding areas of the exam room, and she soon stated: "Somehow, I lost my ring."

16. Mrs. Hart asked her to describe the ring (which Evans said was "diamonds and pearls") and began to assist her in searching the room.

17. Evans and Mrs. Hart searched the drawers, counter-tops, and the pillows on the exam table; as Evans stated she "had had it on my computer" prior to the exam, and "it may have fallen off, as I walked out into the hall."

18. Evans again left the room, stating she wanted to look in the hallway again, returning in a few moments saying she still "could not find" her missing ring.

19. While waiting for the results of the culture, Mrs. Hart expressed her concern that Evans had lost her ring, and offered, without request, an exam of her purse, telling Evans "You can look through it."

20. Evans then stated: "No, Stephanie; I know you would not do a thing like that."

21. Mrs. Hart explained she had on leggings, with no pockets, and, unprompted, raised her blouse to allow Evans to look under her clothing and inside her bra.

22. Mrs. Hart also, unsolicited, began to go through her purse, with Evans watching as she removed all of the items (emptying the contents on the exam table).

23. After the results of the culture were received (a prescription was written for antibiotics) and the medical purposes of her visit had been completed, Mrs. Hart was given processing papers to take to the discharge desk at the front of the office.

24. As she traveled to the checkout desk, Mrs. Hart overheard Evans state to another female member of the staff: "And, he just gave me that ring" (without identifying who the person she was referring to as "He" was).

25. While Mrs. Hart was waiting in line behind other unknown patients, she suddenly saw (for the first time) Defendant Wasson, another female staff member and Toni Richey (whom she later learned to be a Certified Nurse Midwife) quickly approaching her.

26. Defendant Wasson then announced, to the entire office and Mrs. Hart, in a loud, agitated voice (within hearing of all staff and numerous unknown patients in the hallway and adjoining reception): "You can't leave. We have called the Police. You need to come back to this back room and stay there until the Police arrive (motioning to a rear office)."

27. When Mrs. Hart asked "For what?" Defendant Wasson stated: (again in a loud voice): "You will wait back here until the Police arrive."

28. When Mrs. Hart again asked: "Why?" Defendant Wasson said: "Robbin says you stole her ring."

29. When Mrs. Hart attempted to explain she had already shown Nurse Practitioner Evans the inside of her clothes and the contents of her purse, Defendant Wasson said: "You still have to stay here until the Police arrive, so they can search you."

30. Defendant Wasson and Defendant Richey then jointly escorted Mrs. Hart to a back office (containing stored equipment and medical waste

products), where she was again told she would have to remain, pending the arrival of the Tyler Police.

31. When she asked Defendant Wasson: "Even though I showed the contents of my purse and all--- I still have to do this?" Defendant Wasson stated: "Yes, you do," and left the building.

32. Mrs. Hart never saw Defendant Wasson again.

33. After realizing her unusual circumstances and the gravity and possible adverse consequences of the false allegations made against her, Mrs. Hart turned on her cell-phone video and audio recorder (recording 30 or more minutes of events).

34. The Office Manager, Janette McBride, then entered the room where Mrs. Hart was unlawfully confined, identified herself as the Office Manager, and stated: "We are having the Police come."

35. Mrs. Hart again asked: "Do I have to stay?" and was told by Manager McBride: "Yes."

36. Manager McBride stated: "Yes, you have to stay. You were the only person in the room when the ring disappeared."[1]

---

[1] This was an error; a *different* female staff member (other than Evans) had also come into the exam room, to take a throat culture.

37. Manager McBride stated that Defendant Wasson had to leave (i.e. "he has a surgery") but had instructed her to "take over" the resolution of the issue in strict accordance with his instructions.

38. Manager McBride left the room, only to return shortly, stating: "Dr. Wasson wants you to submit to a full vaginal examination, it's just very common that people put stuff up their vagina to can't be found (SIC)."

39. Mrs. Hart attempted to explain that Nurse Practitioner Evans had already examined the contents of her purse, looked inside her clothing and undergarments, and assured her she did not suspect her of stealing her ring (and had volunteered that she "could have dropped it in the hallway.")

40. Manager McBride, however, replied that Evans had not actually told Mrs. Hart she might have "lost the ring in the hallway" but had only "stated that" in hopes of giving her "the opportunity to try to put it back, if she took it."

41. As Mrs. Hart sat, alone and terrified, in a room, unlawfully confined of her liberty, she heard other female staff members of Defendant, P.A., talking loudly, making derogatory comments about the events,

and laughing loudly (as other patients sat, in reception and stood in the hallway, within earshot).

42. Mrs. Hart repeatedly requested McBride to bring Evans back to the room, so all 3 of them might jointly discuss the earlier events and conversations; but Evans never was allowed or required to return (she was "with another patient.")

43. Mrs. Hart inquired, on numerous occasions, how it could be that while other non-African-American patients had been present in nearby exam rooms, a different white female staff-member had been in the "room" to take a throat culture, and others were moving about the hallway in the same timeframe, it was somehow still reasonable for all of the staff associated with Defendant, P.A. (i.e. Wasson, Evans and McBride) to announce they were "all under the assumption that I took it."

44. She was never provided an answer to the question.

45. Instead, for many agonizing and extended minutes, Mrs. Hart remained confined of her liberty ("They are holding me hostage here") until two (2) unknown uniformed male members of the Tyler Police Department arrived.

46. After tediously explaining to the investigating Officers all the above details (including her many efforts to cooperate with revealing the contents of her purse and lifting up her clothing), one of the officers refused to conduct additional searches of her purse or of her person, telling Mrs. Hart he was "just going to write a report."

47. A confrontation then ensued between the investigating Officers and Manager McBride: with Manager McBride justifying the lengthy restraint of Mrs. Hart as "no different than Walmart," and the 2 Police Officers stating their belief that the circumstances were "totally different, though, because Walmart has loss prevention. And they have proof someone has taken something before they detain them."

48. Manager McBride (acknowledging cell-phone orders from Defendant Wasson) stated: "Well, I don't know. I'm just doing what I'm told."

49. Prior to departing, both the Tyler Officers told Mrs. Hart they needed nothing further from her, that her she was "free to go" and stated to Manager McBride: "Do you understand the Police Department is not detaining her?"

50. The 2 investigating Police Officers then left.

51. Humiliated, embarrassed, and fearing grave harm to her previously good reputation and future employment rights by the Defendants

continued false allegations of theft against her and/or complaints of her failure to submit to the demanded physical invasion of her person, to complete the "search" insisted on by Defendant Wasson, as a Vice-Principal of Defendant, P.A, Mrs. Hart, under severe duress caused by the Defendant's conduct, again removed her clothing, and "submitted" to a degrading, embarrassing, and emotionally tormenting invasive search of her private body parts; conducted for no valid medical purpose on behalf of or to benefit Mrs. Hart, but solely to protect and/or investigate the individual property rights of Evans.[2]

52. Mrs. Hart presently believes the unjustified, unlawful, unnecessarily forceful and anguishing physical "search" next conducted of her person, including her private body parts, under the coercive and intimidating circumstances described herein, was at the hands of Defendant, Toni Richey, a Nurse Midwife and Registered Nurse employed by Defendant, P.A., but under the explicit unreasonable instructions of Defendant Wasson, a Vice-Principal of Defendant, P.A.

53. When Defendant Richey entered the room, this time *without* providing Mrs. Hart a medical gown with which to cover herself, she instructed

---

[2] A matter entirely *unrelated* to the health or medical needs of Mrs. Hart.

Mrs. Hart, in a stern, abrupt tone, to "get up on the table" and "put your feet in the stirrups."

54. Defendant Richey again employed a mechanical device (which Mrs. Hart learned was a speculum; a tool used for investigating body orifices), and began, without comment or explanation, to physically insert the device, without any lubrication, in what appeared to be an unnecessarily forceful manner, into her body.[3]

55. In significant physical pain and discomfort, and entirely humiliated by the indignities of the occasion and un-apologetic and unnecessarily forceful nature of Defendant Richey's conduct, Mrs. Hart began to weep.

56. At the end of the tormenting and painful "search" of her person, the "missing ring" of Evans was, of course, not found "hidden inside" the person of Mrs. Hart.

57. The "search" completed, Defendant Richey, apparently agitated at the "unsuccessful" results, abruptly left the room, without a word of comfort, apology, or reassurance to Mrs. Hart.

---

[3] In the earlier regularly-scheduled OB GYN exam, Mrs. Hart had been provided a medical gown with which to cover herself, and the speculum device used had been previously covered with lubricant and gently employed, with the use of substantially less physical force or accompanying discomfort.

PLAINTIFF'S ORIGINAL PETITION,
Page 14.

58. Mrs. Hart was then told, after almost 2 anguishing and terrifying hours, she was "free" to leave the offices of Defendant, P.A.

59. As she exited the building, Mrs. Hart saw the 2 Tyler Police Department vehicles that had responded to the call, with the 2 male Officers still sitting inside, in the parking lot.

60. On seeing the Police vehicles, Mrs. Hart began, once again, to experience uncontrollable emotions, this time including shortness of breath, hysterical crying, and greatly-increased anxiety (causing her to immediately decide to cancel previous plans to do some shopping for her family).

61. After leaving the offices of Defendant, P.A., during her solitary 45 minute drive to her home in Cherokee County, Texas, Mrs. Hart was overcome with fear (as she passed unrelated law-enforcement vehicles along the way), uncontrollable emotions and painful reflections of the events of the difficult morning, requiring her, on 4 or 5 occasions, to pull her vehicle off the highway (to compose herself and recover from the panic attacks).

62. Arriving home, Mrs. Hart found herself unable to function in properly preparing the evening meal for her family, by reason of repeated,

frequent and uncontrollable episodes of fear and panic, and she was soon confined to bed.

63. Since these traumatizing and humiliating events, Mrs. Hart has experienced numerous emotional episodes, flashbacks, nightmares, and sudden unexplained, uncharacteristic outpourings of mental and physical anguish and tearful episodes, on a daily basis (sometimes several times a day), and has experienced many repeating unpleasant reflections of the above-described tormenting moments.

64. The above-described terrorizing events to which Mrs. Hart was exposed at the insistence of Defendant Wasson and Manager McBride, as Vice-Principals of Defendant, P.A., were intentionally engaged in by said Defendants for reasons entirely unrelated to the health or necessary medical services of Mrs. Hart.

65. When Chamberlain Hart, her loving and supporting husband of many years, and the father of her children, learned, later in the day, of the outrageous and unlawful treatment of Mrs. Hart at the offices of Defendant, P.A., he telephoned the offices of Defendant, P.A., and requested (and was promised) a prompt return telephone call from Defendant Wasson, to discuss the false allegations of theft and humiliating circumstances to which Mrs. Hart had been subjected.

66. As of the filing of this action, no such promised return call from Defendant Wasson has been received by Chamberlain Hart.

## IV.
## PLAINTIFF'S CAUSES OF ACTION

1. **Slander *per se*, and Conspiracy to commit Slander *per se*.**

    The publication and/or republication on the occasion in question by Defendant Wasson, as a Vice-Principal of Defendant, P.A., of the false statement that grounds existed to believe that Mrs. Hart had committed a serious crime (i.e. theft of personal property; namely valuable personal jewelry of Defendant, Evans), had concealed the stolen property in her private parts, was refusing to surrender the stolen personal property after being confronted by its owner, Defendant, Evans, and was being properly held at the offices of Defendant, P.A., until she could be arrested by Tyler Police, constitutes slander *per se* under Texas law.

    Because the slanderous *per se* defamation does not involve matters of any public concern (i.e. neither Mrs. Hart nor Defendant Evans are public figures, the property ownership rights do not involve the general public, and the Defendants are not associated with the media), Mrs. Hart is entitled to rely upon the presumption of the

falsity of the published slanderous *per se* statement; and Defendant, P.A., and Defendant, Wasson, must prove the truth of the publication as an affirmative defense (or be held strictly liable under Texas common law).

Because the slanderous *per se* defamation of Mrs. Hart involve only private parties, non-public issues, and non-media defendants, Mrs. Hart is entitled to a presumption of general damages (i.e. injury to her reputation, personal humiliation, and mental anguish and suffering) without additional proof of such general damages.

Because clear and convincing evidence shows the slanderous *per se* defamation of Mrs. Hart resulted from an act of malice, Mrs. Hart is further entitled to a recovery of exemplary damages against Defendant, P.A., and Defendant Wasson, under applicable Texas law, in an amount to be established by the jury in its verdict.

Additionally, because slander *per se* is, under Texas common law, an unlawful purpose, the agreement of 2 or more of the above-named Defendants to publish and/or republish the above-described slanderous *per se* defamation of Mrs. Hart constitutes an unlawful civil conspiracy to engage in an unlawful purpose (i.e. the publication and/or republication of the slander *per se* of Mrs. Hart), accomplished

by a meeting of the minds of 2 or more of the above-named Defendants, with one or more of the above-named Defendants having committed the unlawful act of publishing and/or republishing the slanderous *per se* defamation of Mrs. Hart, resulting in injuries to Mrs. Hart by reason of such conduct.

All of the above-named Defendants found to be members of the above-described civil conspiracy are jointly and severally liable, for the above-described slander *per se* defamation of Ms. Hart, and for all actual damages to Mrs. Hart by the slander *per se* defamation. Texas law vicariously imputes all conduct of any member of the civil conspiracy to each and every other member of the civil conspiracy, to accomplish such joint and several liability.

2. <u>**False Imprisonment, and Conspiracy to commit False Imprisonment.**</u>

The conduct of Defendant, P.A., and its Vice-Principal, Defendant, Wasson, on the occasion in question, amounts to a willful and unlawful detention of Mrs. Hart, without the effective and lawful consent of Mrs. Hart, and without reasonable legal authority or justification. Such false detention and imprisonment was accomplished both by the physical force exerted by Defendant, P.A.,

and its Vice-Principal, Defendant, Wasson, and by unreasonable threats to Mrs. Hart that inspired in her a reasonable fear of injury to her person, reputation, property and employment rights, if she did not submit to such false detention and imprisonment.

The false imprisonment and detention of Mrs. Hart was accomplished without her effective legal consent, as it was accomplished by force, intimidation, or deception as shown by the circumstances set forth herein.

Because the false imprisonment and detention of Mrs. Hart was without a valid arrest warrant, the burden of proof is on Defendant, P.A., and its Vice-Principal, Defendant, Wasson, to show its reasonable use under the circumstances of force and/or intimidation to falsely imprison and detain Mrs. Hart.

Mrs. Hart is entitled to recover from Defendant, P.A., and its Vice-Principal, Defendant, Wasson, her actual damages by reason of the false imprisonment and wrongful detention alleged herein, including her physical injuries and pain, and her intangible injuries such as humiliation, shame, fright, and mental anguish (past and future).

Because the conduct of Defendant, P.A., and its Vice-Principal, Defendant, Wasson, in engaging in the false imprisonment and unreasonable detention of Mrs. Hart under these circumstances is shown, by clear and convincing evidence, to have been caused by malice, Mrs. Hart is entitled to recover exemplary damages against said Defendants in an amount to be established by the jury in its verdict.

Additionally, because false imprisonment and detention is, under Texas common law, an unlawful purpose, the agreement of 2 or more of the above-named Defendants to accomplish the false imprisonment and detention of Mrs. Hart constitutes an unlawful civil conspiracy to engage in an unlawful purpose (i.e. the false imprisonment and detention of Mrs. Hart), accomplished by a meeting of the minds of 2 or more of the above-named Defendants, with one or more of the above-named Defendants having committed the unlawful act of false imprisonment and detention of Mrs. Hart, resulting in injuries to Mrs. Hart by reason of such conduct.

All of the above-named Defendants found to be members of the above-described common law civil conspiracy are jointly and severally liable, as members of the unlawful civil conspiracy to

accomplish the above-described false imprisonment and detention of Ms. Hart, for all actual damages to Mrs. Hart by the false imprisonment and detention. Texas law vicariously imputes all conduct of any member of the civil conspiracy to each and every other member of the civil conspiracy, to accomplish such joint and several liability.

Additionally, because the false imprisonment and detention of Ms. Hart was accomplished by the conduct of the named Defendants in intentionally or knowingly abducting her with the intent to "abuse her sexually" (i.e. by engaging in unlawful conduct that violates §22.011 (a) (1) (A) of Texas Penal Code), in the above-described "search" of Mrs. Hart looking for the missing ring of Defendant Evans), such conduct also violates §22.04 (a) (4) of Texas Penal Code (prohibiting aggravated kidnapping).

Section 33.013 (b) (2) (C) of Texas Civil Practice & Remedies Code expressly provides that, where a defendant, with specific intent to do harm to others, acts in concert with another person to engage in conduct violating §22.04 of Texas Penal Code (i.e. the aggravated kidnapping of Mrs. Hart), such defendant is, in addition to his or her own liability for their own such primary conduct, "jointly and

severally liable" for all damages by Mrs. Hart for such conduct constituting an aggravated kidnapping. Mrs. Hart hereby sues each of the above-named Defendants, jointly and severally, for all such damages, under §33.013 (b) (2) (C) of Texas Civil Practice & Remedies Code.

Additionally, because the false imprisonment and detention of Ms. Hart was accomplished by the conduct of the named Defendants in intentionally or knowingly unlawfully restraining and confining Mrs. Hart, and such conduct violates §20.01 and §20.02 (a) of Texas Penal Code (prohibiting the unlawful restraint of a person without consent), such conduct constitutes additional "grounds" to establish a common-law conspiracy between the above-named Defendants, thereby creating additional grounds for joint and several liability, against each such Defendant, for all damages to Mrs. Hart.

3. **Assault by offensive physical contact, and Conspiracy to commit Assault by offensive physical contact.**

The conduct of Defendant, P.A., its Vice-Principals, Defendant, Watson and Defendant, McBride, constitutes an intentional tort of assault by offensive physical contact with the person of Mrs. Hart. Although the physical contact with the person of Mrs. Hart seen in the

above-described harmful, degrading, embarrassing and emotionally tormenting invasive "search" of the private body parts of Mrs. Hart, conducted for no valid medical purpose, but solely to protect the individual property rights of a staff member of Defendant, P.A., (to wit: Nurse Practitioner, Evans), was achieved, physically, by Defendant, Ritchey, such conduct was caused by the knowing and intentional instructions, as set forth herein, of Vice-Principals of Defendant, P.A., Defendants, Wasson and McBride.

Mrs. Hart alleges that Vice-Principals of Defendant, P.A., Defendants, Wasson and McBride, knew or reasonably should have known that Mrs. Hart would clearly regard the above-described physical contact with and physical invasion of her private body parts, under the circumstances set forth herein, as offensive or provocative, and that such would cause physical pain and discomfort to Mrs. Hart, as well as extreme emotional pain and suffering, but nonetheless instructed and ordered Defendant, Richey, to engage in the offensive contact with the person of Mrs. Hart and the painful, humiliating and emotionally degrading physical invasion of her private body parts.

Mrs. Hart is entitled to recover from Defendant, P.A., and its Vice-Principal, Defendant, Wasson, her actual damages by reason of

the assault by the painful, offensive physical contact alleged herein, including her physical injuries and pain, and her intangible injuries such as the severe humiliation, shame, fright, and mental anguish (past and future).

Because the conduct of Vice-Principals of Defendant, P.A., Defendants, Wasson and McBride, in engaging in the assault by offensive physical contact on Mrs. Hart under these circumstances is shown, by clear and convincing evidence, to have been caused by malice, Mrs. Hart is entitled to recover exemplary damages against said Defendants in an amount to be established by the jury in its verdict.

Additionally, because the assault by offensive physical contact on Mrs. Hart is, under Texas common law, an unlawful purpose, the agreement of 2 or more of the above-named Defendants to engage in the conduct constituting the the assault by offensive physical contact on Mrs. Hart constitutes an unlawful civil conspiracy, at common law, to engage in an unlawful purpose (i.e. the assault by offensive physical contact on Mrs. Hart), accomplished by a meeting of the minds of 2 or more of the above-named Defendants, with one or more of the above-named Defendants having committed the unlawful act of

the assault by offensive physical contact on Mrs. Hart, resulting in injuries to Mrs. Hart by reason of such conduct.

All of the above-named Defendants found to be members of the above-described common law civil conspiracy are jointly and severally liable, as members of the unlawful common-law civil conspiracy to accomplish the above-described assault by offensive physical contact on Mrs. Hart, for all actual damages to Mrs. Hart by the assault by offensive physical contact on Mrs. Hart. Texas law vicariously imputes all conduct of any member of the civil conspiracy to each and every other member of the civil conspiracy, to accomplish such joint and several liability.

Additionally, because the assault by offensive physical conduct on Mrs. Hart was accomplished by the conduct of the named Defendants in intentionally or knowingly causing the penetration of the sexual organs of Mrs. Hart without her effective legal consent (i.e. in the above-described "search" of Mrs. Hart looking for the missing ring of Defendant Evans), such conduct also violates §22.011 (a) of Texas Penal Code (prohibiting sexual assault). §22.011 (b) (9) of Texas Penal Code declares that such penetration of the sexual organs of Mrs. Hart "is without the consent" of Mrs. Hart if "the actor is.......a

health care services provider who causes the other person, who is a patient or former patient of the actor, to submit or participate by exploiting the other person's emotional dependency on the actor." Mrs. Hart alleges that, under the totality of the circumstances described herein, the conduct of Defendant Wasson, and those acting under his instructions herein, constituted the "exploiting" of Mrs. Hart's emotional dependency on Defendant Wasson, as her long-time OB GYN, to cause her to submit to the above-described "search," thereby making such "search" without her effective legal consent, under §22.011 (b) (9) of Texas Penal Code.

Section 33.013 (b) (2) (E) of Texas Civil Practice & Remedies Code expressly provides that, where a defendant, with specific intent to do harm to others, acts in concert with another person to engage in conduct violating §22.011 (a) of Texas Penal Code (i.e. the sexual assault of Mrs. Hart), such defendant is, in addition to his or her own liability for their own such primary conduct, "jointly and severally liable" for all damages recoverable by Mrs. Hart for such conduct constituting a sexual assault. Mrs. Hart hereby sues each of the above-named Defendants, jointly and severally, for all such damages, under §33.013 (b) (2) (E) of Texas Civil Practice & Remedies Code.

### 4. <u>Conspiracy to violate the 1871 Civil Rights Act (i.e. 42 U.S.C. §1985 (3)).</u>

Apart from the common-law tort liability available to Mrs. Hart under the above-described state tort claims, 42 U.S.C. §1985 (3) (commonly referred to as the <u>1871 Civil Rights Act</u> and/or the <u>Ku Klux Klan Act</u>),[4] creates a statutory federal cause of action against 2 or more persons in any state who conspire for the purposes of depriving, directly or indirectly, any person or class of persons equal protection of the laws as U.S. citizens (including the law prohibiting unlawful arrest, detention and searches), by reason of, in whole or in part, racially motivated discrimination or animus against such person.

This federal statutory cause of action against the above-named Defendants is established by the showing that Mrs. Hart was treated unlawfully and inappropriately by the named Defendants, as set forth herein, in part, by reason of the racially motivated animus of the above-named Defendants (and/or 1 or more of them) by reason of her race (i.e. African-American). Such conduct violates 42 U.S.C. §1985 (3), and creates joint and several liability on the part of all members of

---

[4] Of which state courts have *concurrent* jurisdiction, unless Congress expressly stated otherwise in the legislation. See <u>Dowd Box Co. v. Courtney</u>, 368 US 502 (1962); <u>Bennun v. Rutgers</u>, 413 F. Supp. 1274 (U.S.D.Ct.-New Jersey 1976).

such private racially-motivated conspiracy to violate equal protection of the law to Mrs. Hart, for all actual damages of Mrs. Hart, exemplary damages, and attorney's fees arising out of such racially-motivated conspiratorial conduct.

Such federal statutory cause of action preempts all state laws of Texas (including any so-called "tort reform" laws designed to impair and/or restrict the common law rights of Mrs. Hart), to the extent such state laws impair and/or restrict the remedies provided Mrs. Hart against Defendants under 42 U.S.C. §1985 (3).

Mrs. Hart hereby sues each of the above-named Defendants, jointly and severally, under 42 U.S.C. §1985 (3), for all her actual damages, exemplary damages, and attorney's fees.[5]

### V.
### PLAINTIFF'S DEFENSES TO THE DEFENDANT'S LIKELY AFFIRMATIVE DEFENSES
(Pleading only to the Court)

1. **Plaintiff's claims arise out of the Defendant's intentional and unlawful conduct in denying her right to be free from being unlawfully detained, arrested, confined and/or having her person unlawfully searched, without probable cause or her effective legal consent and in violation of her rights to equal protection of the laws as a US citizen.**

---

[5] Reasonable attorney's fees may be recoverable, in the discretion of the Court, pursuant to 42 U.S.C.A. §1988 (b).

**These unlawful events *coincidentally* occurred *at* the medical offices of her OB GYN. No portion of the conduct of which Plaintiff complains, however, relates to or arises out of "safety standards" related to "providing health care services" to Plaintiff. Instead, the Defendant's conduct was undertaken to investigate the individual property rights of a staff member regarding personal property (i.e. a lost ring). As such, the claims of Plaintiff cannot be correctly classified as Health Care Liability Claims.**

Because the conduct of the Defendants complained of by Mrs. Hart occurred, physically, within the confines of the medical clinic maintained and operated in Tyler, Texas, by Defendant, P.A., and because the individual named Defendants were all employed by and/or occupied managerial positions with Defendant, P.A., the Defendants in this action are sure to attempt to assert that the rights of Mrs. Hart are governed by the standards set out in Texas Medical Liability Act in Chapter 74 of Texas Civil Practice & Remedies Code (2011).

Section 74.001 (a) (10) of Texas Civil Practice & Remedies Code defines "health care" as: "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement."

Section 74.001 (a) (13) of Texas Civil Practice & Remedies Code defines a "health care liability claim" as: "a cause of action against a health

care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimants claim or cause of action sounds in tort or contract."

A threshold question is, therefore, whether the claims of Mrs. Hart should be considered Health Care Liability Claims (HCLC). If not, the claims of Mrs. Hart must be considered ordinary civil tort claims, *not based on* safety standards applicable to the "rendering of health care," but based on ordinary legal standards otherwise applicable to all persons, such as Mrs. Hart, including the personal freedoms and liberties of Mrs. Hart, and her right, as a U.S. Citizen, to be free from unwelcome and unlawful conduct (even private conduct) to willfully deprive her of her legal rights, including her right to the sanctity of her body, her right to freedom of movement, her right to liberty, and her right to be free from unreasonable and unlawful searches, including offensive contact with the private parts of her body, without her effective legal consent.

Mrs. Hart submits this Court should determine, preliminarily (as an important *legal* issue), that her claims against these Defendants do ***not***, as a matter of law, constitute an HCLC. As such, they do not fall under the

parameters (substance or procedure) of the <u>Texas Medical Liability Act</u>. <u>Reddic v. East Texas Medical Center</u>, 474 S.W.3d 672 (Tex. 2015) (<u>Reddie</u>).

In <u>Reddie</u>, the Texas Supreme Court, after examining a non-exclusive list of "considerations for analyzing whether a safety standards-based claim is an HCLC," determined that a slip and fall action by a person against a hospital by reason of injuries she sustained when she slipped on a wet floor mat between the hospital's main entrance and its front desk, while at the hospital as a visitor, did not properly qualify as a "health care liability claim." Noting that in an earlier decision (<u>Ross v. St. Luke's Episcopal Hospital</u>, 462 S.W.3d 496 (Tex. 2015)) (<u>Ross</u>), the Court had determined that for a claim to be considered an HCLC "it must have more of a relationship to the provision of health care than that it arises from an occurrence inside a hospital." <u>Id</u>., at 504.

In <u>Ross</u>, the Court said that (a) "[t]he pivotal issue in a safety standards-based claim is whether the standards on which the claim is based implicate the defendant's duties as a health care provider, including its duties to provide for patient safety," and (b) for a claim, even against a health care provider, to be considered an HCLC, a "substantive nexus" must exist between the "safety standards alleged violated and the provision of health care." <u>Id</u>., at 504 & 505.

Ross and Reddie have been cited and followed by the Tyler Court of Appeals in East Texas Medical Center Gilmer v. Porter, (#12-14-00220-CV)(Tex. App.-Tyler 2016, no pet.) (Porter), to classify a slip and fall claim by a *potential* emergency room patient "while walking into" the medical facility, prior to presenting for treatment, but at a time that she was not yet a patient, as not constituting an HCLC. Porter, *supra.*

Because all of the claims of Mrs. Hart arise out of intentional, unlawful conduct related only to a vigorous (albeit unlawful) series of outrageous actions taken solely to investigate alleged violations of individual property rights of a staff member of Defendant, P.A. (i.e. the loss of her "ring" while perhaps on the premises), and entirely unrelated to the providing of health care services or any standard of care regarding the providing of any health care services, the claims of Mrs. Hart are even *more unrelated* to the rendering of health care services than were the claims asserted in Ross, Reddie and Porter.

This Court should thus determine, preliminarily,[6] and as a matter of law, that the claims of Mrs. Hart **are not properly classified as a "health care liability claim" under Texas law,** and are not governed by the terms

---

[6] As such a ruling will dramatically impact the pretrial preparation of all Parties.

of the <u>Texas Medical Liability Act</u> in Chapter 74 of <u>Texas Civil Practice &</u>

<u>Remedies Code</u> (2011).

> 2. **Ordinarily, Texas follows the rule that a corporation cannot**
> **conspire with _itself_, no matter how many of its agents participate.**
> **However, Texas also recognizes an exception where the agents of**
> **the corporation (including vice-principals) conspire with each**
> **other while acting in a _different_ role than their corporate capacity**
> **and/or for a _personal purpose_ unrelated to the business of the**
> **corporation.**
>
> **The unlawful conduct complained of by Mrs. Hart was all**
> **motivated by and engaged in solely to investigate and/or protect**
> **the _individual_ property rights of a staff member of the Defendant,**
> **P.A. (i.e. Robbin Evans). This purpose has _nothing_ to do with the**
> **corporate purposes of Defendant, P.A. (i.e. providing health care**
> **to patients). As such, all members of the staff of corporate**
> **Defendant, P.A., are considered as acting for non-corporate**
> **purposes. Under such circumstances, all members of the staff**
> **(including vice-principals of the corporation) can be held to be**
> **members of a civil conspiracy.**

Mrs. Hart alleges several causes of action sounding in civil conspiracy

(including an alleged civil conspiracy under the 1871 <u>Civil Rights Act</u> found

in 42 U.S.C. §1985 (3)). Because all of the Defendants were employed by

and/or vice-principals in the corporate Defendant, Womens Total Care of

East Texas, P.A., at the time of the conduct, they are sure to attempt to avoid

the joint and several liability result of a finding of their membership in a

civil conspiracy, by relying upon what has come to be referred as the "intra-

corporate conspiracy doctrine." This doctrine, recognized by Texas law,

states a corporation cannot conspire with _itself_, no matter have any of its

agents participate. Christopher v. General Computer Systems, 560 S.W.2d 698 (Tex. Civ. App.-Dallas 1977, writ refused n.r.e.).

This rule, however, is subject to a recognized exception where corporate agents are shown not to have been acting in their capacity as corporate agents, but for their own *personal* purposes, or for purposes unrelated to legitimate corporate purposes at the time of their conduct. Fojtik v. First National Bank of Beeville, 752 S.W.2d 669, 673 (Tex. App.-Corpus Christi 1988, writ denied); Texas-Ohio Gas, Inc. v. Mecom, 28 S.W.3d 129, 137-138 (Tex. App.-Texarkana 2000, no pet.)("Although agents of a corporation cannot form a conspiracy while acting in their corporate capacity, agents can conspire with each other if they are acting in a different capacity or for a personal purpose of their own.")

A recent application of this exception, in a 42 U.S.C. §1985 (3) case, is seen in Goodarzi v. Hartzog, *2013 WL 3110056* (S. D. Tex. [Houston Div.] 2013), where Dussouy[7] was cited, along with other authorities, as follows:

> Three recognized exceptions to the doctrine are (1) where the alleged conspirators have "an independent stake in achieving the object of the conspiracy," (2) where the alleged conspirators are acting for their own purposes, thus becoming independent actors; and (3) where they act outside the scope of their

---

[7] Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594 (5th Cir. 1981).

employment beyond the bounds of their authority or when they engage in unauthorized acts.

*Id,* at Fn. 10.

None of the Defendants, individually, had any valid *corporate* purpose furthered by their unlawful and outrageous conduct. None of their acts related to a valid corporate purpose within their ordinary "jobs" (i.e. the providing of medical services) at Defendant, P.A. As such, the so-called "intra-corporate conspiracy doctrine" does not apply to prevent all of the named Defendants (including corporate Defendant, P.A., via the conduct of Vice-Principals Wasson and McBride) from being found members of a civil conspiracy or conspiracies.

3. <u>Because portions of the conduct of the Defendants constitute felonies under the *Texas Penal Code* (prohibiting aggravated kidnapping and sexual assault), the limitations on the recovery of the amount of exemplary damages against Defendants found in §41.008 (b) of *Texas Civil Practice & Remedies Code*, have no application, under §§41.008 (c) (3) & (5) of *Texas Civil Practice & Remedies Code*.</u>

To the extent the Jury in this case awards exemplary damages against one or more of the named Defendants herein pursuant to the claims of Mrs. Hart arising under the unlawful felonious conduct prohibited by §22.04 (a) (4) of <u>Texas Penal Code</u> (prohibiting aggravated kidnapping), §41.008 (c) (3) of <u>Texas Civil Practice & Remedies Code</u> expressly provides that the

limitations on exemplary damage awards imposed by §41.008 (b) of Texas Civil Practice & Remedies Code "do not apply." As such, the amount of exemplary damages available against the named Defendants for such conduct has no statutory limitations, under Texas law, other than the evidence and the collective conscience of the Jury in this matter.

To the extent the Jury in this case awards exemplary damages against one or more of the named Defendants herein pursuant to the claims of Mrs. Hart arising under the unlawful and felonious conduct prohibited by §22.011 (a) of Texas Penal Code (prohibiting sexual assault), §41.008 (c) (5) of Texas Civil Practice & Remedies Code expressly provides that the limitations on exemplary damage awards imposed by §41.008 (b) of Texas Civil Practice & Remedies Code "do not apply." As such, the amount of exemplary damages available against the named Defendants for such conduct has no statutory limitations, under Texas law, other than the evidence and the collective conscience of the Jury in this matter.

## VI.
## REQUEST FOR DISCLOSURE

Pursuant to Rule 194 of Texas Rules of Civil Procedure, the above-named Defendants are each hereby requested to Disclose, within 50 days of

service of process on each of them, all of the information and/or materials described in Subparts (a) through (l) of Rule 194.2.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that each of the above-named Defendants be served with citation and process and be required to appear and answer herein as required by law, and that upon a full and final hearing of this cause, Plaintiff have and recover of and from each of the above-named Defendants, jointly and severally, all of her actual damages, pre-judgment interest on her actual damages at the highest rate allowed by law, all recoverable attorney's fees (at the trial court level and at the various levels of possible appeal), post-judgment interest on all affirmative recoveries at the highest rate allowed by law, and all relief requested herein, together with such other and further relief, both general and special, at law and in equity, to which she may show herself to be justly entitled.

Respectfully submitted,

**THE LAW OFFICES OF
CARL DAVID ADAMS**
6440 North Central
Expressway,
Suite 505
Dallas, Texas 75206
(214) 468-3032 phone
(214) 871-5090 fax

/s/ *Carl David Adams*

_____

**Carl David Adams, Esquire**
State Bar #00850600
carldavidadams@hotmail.com

**LEAD       COUNSEL       FOR
PLAINTIFF,   STEPHANIE   ANN
HART**

**NORMAN LAW FIRM**
215 E. Commerce Street
(2nd Floor)
Jacksonville, TX 75711
(903) 586-2595 phone
(903) 586-0524 fax

/S/*Steven R. Guy*

_____

**Steven R. Guy, Esquire**
State Bar #08648700
steveguy@normanlawfirm.com

**CO-COUNSEL FOR PLAINTIFF,
STEPHANIE ANN HART**